UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| MIDWEST LUMBER AND DIMENSION, INC., EILEEN DAVIS and DAVID DAVIS, Plaintiffs, | ) ) ) ) | |
| vs. | ) ) | 4:06-CV-153-SEB-WGH |
| BRANCH BANKING AND TRUST COMPANY, Defendant. | ) ) ) | |

**ORDER GRANTING DEFENDANT'S
MOTION TO DISMISS**

**I.   Introduction**

This matter is before the Court on Defendant's Motion to Dismiss, filed February 13, 2007. (Docket Nos. 17-18). Plaintiffs filed a Response on March 20, 2007, (Docket No. 22) and Defendant replied on April 9, 2007. (Docket No. 25).

**II.   Factual and Procedural Background**

Plaintiff, Midwest Lumber and Dimension, Inc. ("Midwest"), is a wholesale supplier of diverse lumber species which it acquires from the northern and southern United States as well as the Appalachian and western regions. The company deals extensively in virtually every variety of hardwoods. (Second Amended Complaint ¶ 7).[1] Midwest also

---

[1] Plaintiffs filed a motion seeking to file a Second Amended Complaint (Docket Nos. 30, 37) which was objected to by BB&T (Docket No. 39). BB&T's objection also included a reassertion of BB&T's Motion to Dismiss. Plaintiffs' Motion is hereby GRANTED. Having concluded that BB&T's Motion to Dismiss must be granted despite Plaintiffs' Second Amended Complaint, the Court declines to address BB&T's substantive objections to the filing of the Second Amended Complaint.

supplies other kinds of lumber when the needs of its customers dictate. Midwest operates a facility approximately 70,000 square feet in size in the town of Bremen, located in northern Indiana, where dimension products are manufactured. (*Id*.). Midwest's corporate headquarters are located in the far southern part of Indiana, in Maritime Center in Clark County. (*Id*.). Plaintiffs David K. Davis and Eileen A. Davis ("the Davises") are Midwest's principals.

Prior to 2004, Midwest successively financed its "working capital" first with National City Bank ("National City") and then with Regional Bank ("Regional"). (Second Amended Complaint ¶ 9). At both National City and Regional, Midwest's contact was with Frank M. "Buzz" Benson ("Benson"), who initially was a loan officer at National City and later became Senior Vice President at Regional. (*Id*.). Over approximately fifteen years, from 1984 until 1999, National City extended a $2.5 million working capital open line of credit to Midwest. (*Id*. ¶ 10). After Benson had left National City and was employed by Regional, in 1999, in response to Benson's solicitations, Midwest refinanced its working capital loan facility with Regional, which credit was secured by its then current accounts receivable and inventory. (*Id*. ¶ 11).

## A.  The Lending Relationship

In 2004, Defendant Branch Banking and Trust ("BB&T") solicited Midwest's business and eventually was engaged to refinance Midwest's working capital. (Second Amended Complaint ¶ 8). Alex Hacker ("Hacker"), acting on behalf of BB&T, based on

his familiarity with Midwest's business operations and its need for working capital financing developed when he was previously employed in National City's loan department, made the approach to Midwest for its business and eventually closed a financing agreement with Midwest. (*Id*. ¶¶ 9,12).

In August 2004, Hacker informed Eileen Davis that he had an understanding of Midwest's current financial condition and continuing cash flow needs. Hacker further represented to the Davises that BB&T would refinance Midwest's working capital line of credit, which would be secured by its inventory, accounts receivable, and real estate, with terms more favorable than those that were currently being provided by Regional. (Second Amended Complaint ¶ 12). According to Plaintiffs, on August 22, 2004, Hacker requested that the Davises endorse BB&T's "standard form" commitment letter ("the August 22 Commitment Letter") to demonstrate that "they were serious" in considering BB&T's working capital financing. (*Id*. ¶ 12, Ex. A).[2] Eileen Davis responded to Hacker's request by telling him that Midwest was currently dealing with some unresolved inventory issues. Hacker assured her that the inventory issues could be resolved after closing. (*Id*. ¶ 12). On August 25, 2004, David Davis, acting on behalf of Midwest and individually as guarantor, executed the August 22 Commitment Letter; Eileen Davis also signed it on the same day. (*Id*. at Ex. A).

---

[2] Plaintiffs allege that in connection with this transaction Hacker did not inform the Davises that BB&T intended to exclude from the loan base the current accounts receivable of certain long-term customers that BB&T later came to characterize as "contra accounts." Midwest had previously relied on these current accounts receivable to collateralize its working capital financing with Regional. (Second Amended Complaint ¶ 13).

In the August 22 Commitment Letter, Defendant agreed to provide Midwest with a term loan in the maximum principal amount of $1,281,000, along with a revolving line of credit in the maximum principal amount of $2,500,000. (Second Amended Complaint ¶ 15). The August 22 Commitment Letter included a provision excluding accounts from Midwest affiliates in establishing the borrowing base. However, Plaintiffs allege that Midwest had no affiliates. Hacker failed to provide Plaintiffs with copies of the loan documents that were referred to in the August 22 Commitment Letter. (*Id.* ¶ 14). Hacker instructed Eileen Davis to obtain a short extension of its Regional financing until he could have the BB&T closing documents prepared. In response to Eileen Davis's request, Regional granted an extension. (*Id.* ¶ 15).

Following their execution of the August 22 Commitment Letter, the Davises signed a second commitment letter on October 6, 2004 ("the October 6 Commitment Letter"). (Second Amended Complaint ¶ 15).[3] Based on Hacker's representations that BB&T would provide more favorable financing than Regional had provided, the Davises, acting on behalf of Midwest, entered into a Commitment Agreement to refinance its working capital financing through BB&T with a Loan Facility of $1,545,000 and a Credit Facility of $2,500,000. (*Id.* ¶ 17; Brief in Support of Motion to Dismiss at Ex. B). Hacker again

---

[3]On October 5, 2004, Regional offered to increase its existing financing to $2.5 million on essentially the same terms as the current financing agreement between Midwest and BB&T. Hacker countered the Regional offer with a proposal that he described as more favorable than the financing commitment offered by Regional. In reliance upon Hacker's assurances, Midwest declined to accept Regional's offer and accepted BB&T's offer as made by Hacker. Regional's offer of credit expired without acceptance from Midwest. (Second Amended Complaint ¶ 16).

did not advise the Davises that under this agreement BB&T would exclude accounts receivable ("contra accounts") that Midwest had previously used to collateralize its working capital financing with Regional. Again, Hacker did not provide the Davises with copies of the loan documents referenced in the October 6 Commitment Letter until after the time Regional's refinancing commitment expired. (Second Amended Complaint ¶ 17). On October 8, 2004, David Davis, acting on behalf of Midwest and individually as guarantor, executed the October 6 Commitment Letter; Eileen Davis executed it on October 12, 2004. (Brief in Support of Motion to Dismiss at Ex. B).

Both of the Commitment letters executed by the Davises provide that the "Bank shall have the right to exclude any receivable from Eligible Accounts and any item of inventory from eligible Inventory." The Commitment Letters also provide that "[t]he Borrower shall execute a comprehensive loan agreement which shall supersede this Commitment Letter and all agreements formed by its acceptance . . . . " (*Id.*).

On October 12, 2004, BB&T entered into a Loan Agreement (the "Loan Agreement") with Midwest (as borrower) and the Davises (as guarantors), pursuant to which BB&T extended to Midwest a term loan in the principal amount of $1,545,000 and a revolving line of credit in the maximum principal amount of $2,500,000. (Brief in Support of Motion to Dismiss at Ex. C).[4] Section 10.17 of the Loan Agreement includes a

---

[4]The Loan Agreement specified that the amount that could be advanced pursuant to the Line of Credit was based on a percentage of eligible collateral, referred to as the "Borrowing Base." According to Schedule DD, which is a part of the Loan Agreement, certain items do not qualify as a part of the Borrowing Base. Section DD.03 explains that items not included in the Borrowing Base include: accounts aged more than 90 days from the original invoice date; those

merger and integration clause as follows:

> between Borrower and Bank with respect to the Loans, and there are no oral or parol agreements existing between Bank and Borrower with respect to the Loans which are not expressly set forth in the Loan Documents.

(*Id.*).

In addition to the Loan Agreement, Midwest executed a line of credit note and a promissory note. (*See Id.* at Exs. E, F). Also in connection with the Loan Agreement, an ABL Credit Line Sweep Services Agreement (the "Lockbox Agreement") was executed, pursuant to which all of Midwest's receivables would be mailed to and deposited in a lockbox account. (*Id.* at Ex. G). In order to further secure payment of the Loans, the Davises each executed two guaranty agreements. (*Id.* at Ex. H). Finally, the Loans were also secured by valid first perfected mortgage liens in favor of BB&T on Midwest's two parcels of real property, located at 2550 Centennial Boulevard, Jeffersonville, Indiana, and 1820 Dogwood Road, Bremen, Indiana, as well as a Security Agreement.

At the loan closing, BB&T was represented by counsel, but Midwest and the Davises were not represented by counsel.[5] (Second Amended Complaint ¶ 18). The

---

accounts which are referred to as "contra accounts"; inter-company accounts; and any accounts which, at the discretion of BB&T, are deemed doubtful for collection for any reason including, but not limited to, disputes, returns, and legal proceedings, whether in process or pending. (Brief in Support of Motion to Dismiss at Ex. C).

[5]Though Plaintiffs allege that they were not represented by counsel, their counsel did issue an opinion letter, dated October 12, 2004, in which the Indianapolis, Indiana, law firm of Ogletree Deakins, serving as counsel for Midwest as well as for the Davises individually, represented: "We have examined and are familiar with" the loan documents, including the Loan Agreement, the Notes and the Guarantees. Midwest's counsel further represented that "[t]he Loan Documents have been duly executed and

Davises informed Hacker that the loan documents prepared and tendered by BB&T did not reflect the open line of credit that he had previously offered, but instead provided for BB&T to unilaterally determine the eligibility of specific to serve as collateral; to determine inventory eligible for collateral; to limit the advance rate to 40% of eligible inventory; to cap the loan advance to $1,000,000; and to require weekly reporting.  Hacker responded to the Davises' objections, saying everything would be "okay," and that BB&T would "work it out," "not to worry," "trust me," and that he would "get it all taken care of."  (*Id.*).

The Davises claim that, as a result of what turned out to be Hacker's misrepresentations, they permitted their financing with Regional to expire, and thus they had no alternative but to sign the BB&T loan documents in reliance on Hacker's assurances that the loan and credit terms would later be adjusted to meet Midwest's needs. (*Id.* ¶ 19).

In addition to these objections the Loan Agreement and the accompanying documents, Plaintiffs sought and received three amendments to the Loan Agreement by BB&T.  First, Hacker prepared an amendment that increased the advance rate of Eligible Inventory from 40% to 50%.  (Second Amended Complaint ¶ 19, Ex. B).[6]  Second, on October 20, 2004, Mr. Poindexter, another BB&T employee, amended the Loan

---

delivered by Borrower [and] constitute Borrower's valid and binding obligations enforceable in accordance with their respective terms." (Brief in Support of Motion to Dismiss at Ex. I).

[6]Within 8 days of the loan closing, Hacker left his employment with BB&T.

Agreement to increase the total loan advance from $1,000,000 to $1,250,000. (Second Amended Complaint ¶ 19, Ex. B).[7] Third, BB&T, through Poindexter, authorized an additional $400,000 to the Borrowing Base. (Second Amended Complaint ¶ 19).

**B.   Midwest's Loan Defaults And The Loan Modifications and Releases**

Within three months of the loan closing, Plaintiffs allege that BB&T failed to act on Hacker's and Poindexter's representations that they would work with the Davises to correct inventory issues as well as the prior exclusion from Midwest's borrowing base of the "contra accounts." After failing to make these adjustments, BB&T informed Midwest that, despite its having numerous sources of collateral, it was not in compliance with the loan requirements, and referred the matter to Kevin Zemanski, a member of its "workout department." (Second Amended Complaint ¶ 20). Within one year after the closing of the initial Loan Agreement, the parties' workout negotiations generated several amendments to the Loan Documents. The Line of Credit Note was modified by two Note Modification Agreements between Midwest and BB&T, respectively, dated October 12, 2005, and November 9, 2005. (Brief in Support of Motion to Dismiss at Ex. J). The Term Loan Note was also modified by a Note Modification Agreement, dated November 9, 2005. (*Id*. at Ex. K).

The Term Loan and the Line of Credit Note were further modified by the execution

---

[7]Poindexter confirmed to Eileen Davis that he was aware that the executed October 12 loan and credit facility were different than those previously represented to the Davises. However, within two weeks, after the material changes had been made, Poindexter also left his employment with BB&T. (Second Amended Complaint ¶ 19).

of two Forbearance and Loan Modification Agreements, dated October 31, 2005, and November 14, 2005, respectively, between Midwest, the Davises and BB&T ("the Forbearance Agreements"). In each of these Forbearance Agreements, Midwest acknowledged that it was in default on the Loans in that, among other defaults, it had violated the financial covenants contained in Section 5 of the Loan Agreement. (Brief in Support of Motion to Dismiss at Ex. L).

With the 2005 modifications, BB&T agreed to forbear from immediately declaring the Loans in default and, among other actions, it (a) extended the November 12, 2005 Line of Credit maturity date by a year to November 12, 2006, (b) permitted Midwest to borrow an amount not to exceed $100,000 in excess of the then-existing Borrowing Base, and (c) permitted Midwest to have a tangible net worth deficit not to exceed $447,000, as of December 31, 2005, to be reduced by specified amounts by specified dates. (*See Id.* ¶¶ 4, 6, 9).

As a material inducement to BB&T to agree to the terms set out in these Forbearance Agreements and undertake the substantial accommodations to Midwest referenced above, Midwest and the Davises gave comprehensive written releases to BB&T as set forth in paragraph 9 of each Forbearance Agreement. Paragraph 9 (in each agreement) provides, in relevant part, that Plaintiffs:

> hereby release and forever discharge BB&T, its officers, directors, attorneys, employees, predecessors and successors (the "Released Parties") of and from any claims, demands, obligations, actions, causes of action, damages, costs

> (including without limitation court costs and attorneys' and paralegals' fees and expenses), expenses and compensation of any nature whatsoever (collectively, "Claims"), known or unknown, whether based in tort, contract or any other theory of recovery, or which may exist or might be claimed to exist at or prior to the date of this Letter Agreement on account of or in any way arising out of the banking relationship between Midwest, the Bank and its successors . . . .

(*Id.*).

Plaintiffs were never able to perform in accordance with the terms of the Forbearance Agreements, which led them on October 24, 2006, to file for Chapter 11 bankruptcy protection. (Brief in Support of Motion to Dismiss at 8). Four days prior to seeking bankruptcy protection, Plaintiffs filed a Complaint against BB&T. (Plaintiffs thereafter filed an Amended Complaint and Second Amended Complaint). In their Second Amended Complaint, Plaintiffs allege that BB&T's inducements of them to forego financing from Regional constituted a:

a) misrepresentation; b) breach of the covenant of good faith and fair dealing; c) interference with business relationships; d) breach of fiduciary duty; e) undue control, economic duress, and business coercion; and f) negligent misrepresentation, and that BB&T's actions entitled Plaintiffs to punitive damages.[8]

BB&T has moved to dismiss each of Plaintiffs' claims, arguing that Midwest is bound by the merger and integration clause contained within the Loan Agreement and the releases in the Forbearance Agreements which released BB&T of any liability towards

---

[8] In their original complaint, Plaintiffs also alleged infliction of emotional distress, but have since withdrawn that claim.

Midwest and the Davises.  Accordingly, each of Plaintiffs' claims fails as a matter of law. Having carefully reviewed the Loan Documents and considered the parties' arguments, the Court concludes that each of Plaintiffs' claims are, indeed, barred by the releases and must be DISMISSED.

### III.     Legal Standard

When ruling on a Rule 12(b)(6), F.R.Civ.P., motion to dismiss for failure to state a claim, the Court must accept as true all well-pleaded factual allegations contained in the complaint as well as the inferences reasonably drawn therefrom.  *See Baxter by Baxter v. Vigo County Sch. Corp.,* 26 F.3d 728, 730 (7th Cir. 1994).  A dismissal is only appropriate if a plaintiff can establish no set of facts, even if hypothesized, consistent with the allegations of its complaint that would entitle it to relief.  *See Sanjuan v. Am. Bd. Of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir. 1994), *cert. denied,* 516 U.S. 1159 (1996).  Moreover, the Court is limited to an examination of the complaint, without delving into the merits of the lawsuit.  *See Autry v. Northwest Premium Servs., Inc.,* 144 F.3d 1037, 1039 (7th Cir. 1998).

### IV.     Analysis

Plaintiffs have brought this suit against BB&T claiming that they were coerced into signing the Loan Agreement based on misrepresentations made by two of Defendant's employees.  Because of these misrepresentations, Plaintiffs allege that they suffered

various forms of damage.  BB&T rejoins with three defenses to Plaintiffs' allegations: First, that the merger and integration clause within the Loan Agreement forecloses all of Plaintiffs' claims; second, the releases signed by Plaintiffs are valid and enforceable and relieve them of any liability under these agreements; and, third, that each of Plaintiffs' claims fails as a matter of law.  Because in our judgment the releases are valid and enforceable and were not the result of duress applied to the individual Plaintiffs, they foreclose any liability on each of Plaintiffs' claims.  Accordingly, we decline to address BB&T's other defenses to the claims against them.

### A.   Forum Selection Clause in the Loan Agreement

As a preliminary matter, we must resolve an issue relating to the forum selection clause in the Loan Agreement.  This issue apparently escaped the parties' attention since it was not developed in the briefings.  The forum selection clause provides that Plaintiffs agree "that any legal action or proceeding arising out of or relating to [the Loan Agreement] may be instituted in any Kentucky state court or federal court sitting in the Commonwealth of Kentucky . . . ."  (Brief in Support of Motion to Dismiss at Ex. C). Despite this provision in the Loan Agreement, Plaintiffs brought this lawsuit in this federal district court which sits in Indiana.  Forum selection clauses are generally enforceable, but enforcement may be waived.  *See Sharpe v. Jefferson Distributing Co.*, 148 F.3d 676, 679-680 (7th Cir. 1998); *Frietsch v. Refco, Inc.*, 56 F.3d 825, 830 (7th Cir. 1995).  Here, BB&T has not sought to enforce the forum selection clause, prompting the Court, therefore, to deem it waived.

### B.   Enforcement of the Releases

There are numerous written agreements that have been entered into between BB&T, the Davises, and Midwest, including:  two commitment letters, the Loan Agreement, schedule DD, two promissory notes, the Lockbox Agreement, four Guaranty Agreements, three Note Modification Agreements, and two Forbearance Agreements (which contain the releases).  With such a plethora of contracts and agreements, the Court must determine whether the releases are enforceable and, if so, whether their terms effectively foreclose all of Plaintiffs' claims.  We begin by examining the issue of what law governs here.

This is a suit based on the court's diversity jurisdiction.  A federal court sitting in diversity jurisdiction is to apply its own procedural laws and the substantive laws of the state in which it sits.  *First Nat. Bank and Trust Corp. v. American Eurocopter Corp.*, 378 F.3d 682, 689 (7th Cir. 2004).  This would seem to suggest that Indiana substantive law controls our analysis.  However, '[i]f the laws of more than one jurisdiction arguably are in issue, *Erie* also requires a federal court to apply [the forum] state's choice of law rules." *Jean v. Dugan,* 20 F.3d 255, 260-61 (7th Cir. 1994).  Thus, because Kentucky and/or North Carolina laws may also be implicated here, we apply Indiana's choice of law rules.

Under Indiana law, choice of law rules for contracts require the court to apply the law of the place with the "most intimate contacts" or "most significant relationship" to the dispute.  *Nucor Corp. v. Aceros Y Maquilas de Occidente S.A. de C.V.*, 28 F.3d 572, 581 (7th Cir. 1994).  The Supreme Court of Indiana, in *W.H. Barber Co. v. Hughes,* held that

this test requires an examination of "all acts of the parties touching the transaction in relation to the several states involved," and that "the law of that state with which the facts are in most intimate contact" must be applied. *W.H. Barber Co. v. Hughes,* 63 N.E.2d 417, 423 (Ind. 1945). In determining which state has the most intimate contacts, Indiana courts must consider the following factors: (1) the place where the contract was consummated: (2) the place where contract negotiations occurred; (3) the place of performance of the contract; (4) the location of the subject matter of the contract; and (5) the location of the parties. *Employers Ins. of Wausau v. Recticel Foam Corp.,* 716 N.E.2d 1015, 1024 (Ind. Ct. App. 1999).

The parties failed to brief the choice of law issue; nonetheless, it is apparent from the Second Amended Complaint and other portions of the parties' briefs that Indiana law applies in interpreting the term of the releases. Plaintiffs include two persons who are Indiana residents and their Indiana-based business. The subject matter of the contract (to wit, the funds and financing provided by BB&T for the benefit of Midwest) is located in Indiana, and the contract was performed in Indiana. BB&T, a North Carolina company, is the only contact with North Carolina. In addition, the letterhead on which the Forbearance Agreements were written listed a Kentucky address for BB&T. Conceivably, the place of contracting and negotiation of the subject contracts were both in Kentucky. Nevertheless, the significance of the contacts with Indiana establishes that the most intimate relationship with this contract is with Indiana. Indiana is the place possessing the greatest interest in having its laws applied with regard to the financing of businesses within its boarders. For

these reasons, we shall apply principles of Indiana law in interpreting the releases.

### C. The Releases Are Valid Under Indiana Law

Under Indiana law, a release agreement is a contract by which a party's right to prosecute a cause of action against the other party to the contract is surrendered. *Zollman v. Geneva Leasing Assocs., Inc.*, 780 N.E.2d 387, 392 (Ind. Ct. App. 2002). Enforcing release agreements serves a vital public policy by facilitating the orderly settlement of disputes. *Indiana Bell Telephone Co., Inc. v. Mygrant*, 471 N.E.2d 660, 664 (Ind. 1984). As is true with other contracts, the interpretation of a release is determinated by its terms, considered in light of all of the facts and circumstances. *Prall v. Indiana Nat'l Bank*, 627 N.E.2d 1374, 1377 (Ind. Ct. App. 1994). However, in the absence of some ambiguity within the terms of the release, our analysis is limited to the four corners of the release agreement in determining the intentions of the parties. *Id.*

In the case at bar, the releases set out in the Forbearance Agreements, signed by Plaintiffs, clearly and unambiguously provide that Plaintiffs:

> hereby release and forever discharge BB&T, its officers, directors, attorneys, employees, predecessors and successors (the "Released Parties") of and from any claims, demands, obligations, actions, causes of action, damages, costs (including without limitation court costs and attorneys' and paralegals' fees and expenses), expenses and compensation of any nature whatsoever (collectively, "Claims"), known or unknown, whether based in tort, contract or any other theory of recovery, or which may exist or might be claimed to exist at or prior to the date of this Letter Agreement on account of or in any way arising out of the banking relationship between Midwest, the Bank and its successors . . .

(Brief in Support of Motion to Dismiss at Ex. L). This language plainly expresses the fact

that Plaintiffs intended to and have discharged BB&T from any liability "on account of or in any way arising out of" the parties' banking relationship.  Each and every one of Plaintiffs' claims in this litigation against BB&T arises out of their banking relationship.  Because these claims have been relinquished previously, they must be DISMISSED here.

Plaintiffs have argued that the releases are not enforceable due to their having been under economic duress when they signed the Forbearance Agreements.  The Davises contend that they had no other choice than to sign them.  This argument is a non-starter, however, in the absence of any legally cognizable evidence that Plaintiffs were under economic duress when they executed this release.

The Indiana Court of Appeals has ruled that a release "will be deemed void as against public policy where there is unequal bargaining power between the parties such that the party against whom the release is to be enforced did not 'knowingly and willingly' execute the release." *Marshall v. Blue Springs Corp.*, 641 N.E.2d 92, 95 (Ind. Ct. App. 1994)(citing *LaFrenz v. Lake County Fair Bd.*, 360 N.E.2d 605 (Ind. Ct. App. 1977)).  A release is "knowingly" signed when the individual who signs it does so with an understanding of its contents, and it is "willingly" signed when there is no economic or other duress. *Clanton v. U.S.*, 686 N.E.2d 896, 899 (Ind. Ct. App. 1997).  As we have previously held in *Flynn v. AerChem, Inc.*:

> The traditional definition of duress in Indiana does not include economic duress.  Modern courts, however, interpret duress as a deprivation of the free exercise of the victim's own will, which may include economically-based duress.  The assertion of duress must still be supported by evidence establishing that the duress resulted from the defendant's wrongful and

> oppressive conduct *and not by the plaintiff's necessities*. Mere threats, inconvenience, or delay do not constitute duress unless they truly subvert the victim's will.

*Flynn v. AerChem, Inc.*, 102 F.Supp.2d 1055, 1061 (S.D. Ind. 2000)(emphasis added).

Plaintiffs' execution of the Forbearance Agreements reflected their decision, voluntarily made, that the benefits to them were worth their bargained-for exchange. Plaintiffs received, among other benefits, one year extension of the maturity date on Midwest's Line of Credit and access to an additional $100,000 loan. In exchange for these benefits from BB&T, Plaintiffs were required to release BB&T from all liability, whether sounding in tort or contract arising out of the parties' banking relationship. There was no inequality in the irrespective bargaining power. Additionally, any economic duress that Plaintiffs were under when they signed the Forbearance Agreements was not brought about by any improper actions on the part of BB&T, but instead reflected Plaintiffs' business "necessities." A party is not under economic duress as that term is used in this context when it has to secure additional money and time from a financial institution in order to pay off a loan.

Furthermore, having reaped the benefits of the additional $100,000 and the additional one-year extension of the maturity date, Plaintiffs' current desire to rescind the releases is too late. Indiana law requires that any party wishing to avoid the effects of a previously granted release must first give back any consideration it received in exchange for the release. *Prall*, 627 N.E.2d at 1379. "Full restoration of the consideration received for a release is a condition precedent to the maintenance of an action for the recision of a

contract or the avoidance of the bar raised by the pleading of the release." *Id*. Plaintiffs have neither pled nor provided any evidence to establish either that they have returned or intend to return the consideration given by BB&T. Thus, even if the Court were to conclude that evidence exists to show that Plaintiffs signed the release under economic duress, absent their return of the consideration to BB&T, Plaintiffs are not entitled to be relieved of the effects of the release.

Having determined that the releases clearly and unambiguously released BB&T from any claim by Plaintiffs arising out of their banking relationship and having further found that Plaintiffs were not under economic duress when they signed the releases and that Plaintiffs have not returned the consideration they received from BB&T in exchange for signing the releases, all of Plaintiffs' claims in the Second Amended Complaint must be DISMISSED.

## V.     Conclusion

Plaintiffs' Motion for Leave to File Second Amended Complaint is **GRANTED**. Defendant BB&T's Motion to Dismiss the Second Amended Complaint is **GRANTED**, and all of Plaintiffs' claims in the Second Amended Complaint are hereby **DISMISSED**.

IT IS SO ORDERED.

Date:  09/20/2007

*[signature: Sarah Evans Barker]*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

<u>Copies to</u>:

Lea Pauley Goff
STOLL, KEENON & PARK LLP
lea.goff@skofirm.com

Charles Thomas Hectus
HECTUS & STRAUSE PLLC
cthectus@hectusandstrause.com

Richard M. Trautwein
RICHARD M. TRAUTWEIN, PSC
P. O. Box 764
Prospect, KY 400559